UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**JOAN ANDERSEN**, individually and as a
representative of enrollees in Medicare+Choice
residing in Suffolk County, et al.,

                              Plaintiffs,

            - against -

**MICHAEL LEAVITT**, Secretary of the
U.S. Department of Health and Human Services,[1]
et al.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
on Defendants' Motion for
Summary Judgment (docket no. 30)
and Plaintiffs' Motion for Partial
Summary Judgment (docket no. 38)

**Civil Action No.  03-6115** (DRH)

**APPEARANCES:**

*For the Plaintiff*s:

CAHN & CAHN, LLP

445 Broadhollow Road, Suite 332

Melville, NY  11747

        **By:**    **Richard C. Cahn, Esq.**

*For the Defendants*:

Roslynn R. Mauskopf, United States Attorney

Eastern District of New York

1 Pierrepont Plaza, 14th Floor

Brooklyn, NY 11201

        **By:**    **Michael J. Goldberger, Asst. U.S. Attorney**

**HURLEY, Senior District Judge:**

---

    [1]  Michael Leavitt has replaced Tommy Thompson as U.S. Secretary of Health and
Human Services.  Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Leavitt is
automatically substituted as Defendant in this action in place of Mr. Thompson.

This case focuses on the often-confusing arena of Medicare and the legislation and regulations that govern it. Plaintiffs, senior citizens and Medicare beneficiaries residing in certain suburban New York counties surrounding New York City, challenge both (1) the mechanism under which health care organizations are reimbursed for providing Medicare beneficiaries with medical care and (2) the fact that, as a result of their geographic location, Plaintiffs do not share the same benefits as other Medicare beneficiaries located in different, but neighboring counties. The crux of Plaintiffs' suit against Defendants is that, as a result of locality, they must pay more for Medicare services provided by health care organizations (or HMOs) than do other seniors located in the borough counties of New York City. As a result, Plaintiffs assert they have been discriminated against and their Fifth Amendment right to equal protection under the law has been violated.

Presently before the Court are two motions: (1) Defendants' motion for summary judgment on both the Constitutional claims (the first, second, and third causes of action in the complaint) and the Freedom of Information Act ("FOIA") claim (the fourth cause of action) and (2) Plaintiffs' motion for partial summary judgment on their FOIA claim with a request for attorneys' fees. As set forth below, Defendants' motion is granted and Plaintiffs' motion is denied.

## I. Background

The following facts are gleaned from the Parties' Rule 56.1 Statements and are

undisputed unless otherwise noted.  Indeed, there are few disputes before the Court.[2]

Established by an act of Congress in 1965, Medicare is the program that provides health insurance coverage to individuals over the age of 65 (hereinafter, "seniors" or "beneficiaries") and certain others.  Generally, Medicare Part A provides insurance coverage for inpatient hospital treatment at no cost to all individuals reaching the eligible age and Medicare Part B provides insurance coverage for doctor visits and certain outpatient treatment to eligible seniors who elect to enroll by paying a monthly fee to the government. Traditional Medicare pays for beneficiaries' medical services on a "fee-for-service" basis.  The fee for service basis is similar to traditional indemnity health insurance plans.  Under traditional Medicare's fee for service basis, the insured is responsible for a deductible, after which Medicare pays its share and the insured pays his/her share for covered services.  Medicare's share is paid pursuant to a fee schedule which depends, in part, on the geographic area in which the provider works as reflective of the geographic variation in the cost of providing services.  *See generally* 42 U.S.C. § 1395w-4(e) (requiring the Secretary to establish geographic adjustment factors for all physician services for each fee schedule area).

In an effort to contain its costs for providing this health insurance, in 1985, Medicare began entering into "risk contracts" with managed care organizations (also known as "health management organizations" or "HMOs"[3]).  Under these contracts, HMOs would receive a predetermined payment each month–known as a capitation rate–to cover all Medicare services

---

[2]  The Court will address the pertinent facts relating to Plaintiffs' FOIA cause of action, *infra*, Part II(D).

[3]  For convenience, the Court will refer to managed care organizations as "organizations" or "HMOs".

they provided to seniors, regardless of the cost of the actual services the organizations provided in a given month.  Seniors were, and remain, eligible to receive benefits on a fee-for-service basis, but could elect to join an HMO.

Between 1985 and 1997, capitation rates were established for each county in the United States at the rate of 95% of the Adjusted Average Per Capita Cost ("AAPCC")[4] for medical services in the respective county.  That is, a county's capitation rate was equal to 95% of the projected cost of providing Medicare services on a fee for service basis in that county.  This method was changed with the 1997 introduction of the Medicare+Choice program ("M+C").[5]

Under M+C, starting in 1998, capitation rates were to be set at the greater of three values: (1) a minimum payment amount specified in the statute at $367 per month in 1998 and indexed for future years; (2) a minimum percent increase specified by statute over the prior year's final rate, generally 2 or 3%; and (3) a blended formula which was a weighting of something called an area-specific rate and something called a national input price-adjusted rate.  Under the blended formula, the relative weight of the local figure was reduced and the weight of the national average was raised until the blended rate consisted of 50% of each.  *See* 42 U.S.C. § 1395w-

---

[4]  "The AAPCC is *Medicare's projected* fee-for-services *cost* in a particular county." (Defs.' Reply Mem. at 9 (emphasis added).)  *See* 42 U.S.C. § 1395mm(a)(4) ("the term 'adjusted average per capita cost' means the average per capita amount that the Secretary estimates in advance (on the basis of actual experience, or retrospective actuarial equivalent based upon an adequate sample and other information and data, in a geographic area served by an eligible organization or in a similar area, with appropriate adjustments to assure actuarial equivalence) would be payable in any contract year for services covered under parts A and B of this subchapter . . . if services were to be furnished by other than an eligible organization . . . .")

[5]  M+C was established through Congress' 1997 passage of the Balanced Budget Act.

23(c)(2).[6]  By statute, the Centers for Medicare and Medicaid Services (the "Center") was directed to calculate the minimum payment amount, the minimum percent increase and the blended formula  values for every county and apply the greater of the three to establish the capitation rate for each county.[7]  *See* 42 U.S.C. § 1395w-23(c).

Five years later, in 2003, Congress passed the Medicare Modernization Act. The Medicare Modernization Act renamed the M+C program as Medicare Advantage (MA).[8]  More importantly, this legislation added a fourth value to be considered by the Center in determining a county's capitation rate, namely, 100% of AAPCC.[9]  Similar to the earlier statute, the Center was required to determine the capitation rate for every U.S. county, but now it had to calculate four formulas and choose the one that yielded the highest rate.  In 2005, the blended rate and minimum amounts were eliminated, resulting in the capitation rates set as the higher of a 2% increase over the previous year's capitation rate or 100% of the AAPCC.

The Parties dispute whether the Center has discretion to consider capitation rates of other counties when establishing the capitation rate for a particular county.  Relying on the Declaration

---

[6]  By its inclusion of the minimum percent increase and the blended rate, M+C did not abandon the old AAPCC rates.  The inclusion of an increasingly significant national figure into the calculation was designed to decrease the amount of payment variation across the country over time.

[7]  The statute refers to "MA local area" and defines that term as "a county or equivalent area specified by the Secretary."  42 U.S.C. § 1395w-23(d)(2).

[8]  Within this Memorandum & Order, the Court's reference to the M+C program shall include the subsequent MA program.  The Court may also refer to the two programs as "M+C/MA".

[9]  The fourth value was to be considered in determining 2004 capitation rates.

of Solomon Mussey, director of the Medicare and Medicaid Cost Estimates Group within the Office of the Actuary of the Center, Defendants assert that "[the Center] does not, and cannot, consider the capitation rate in one county when establishing the capitation rate in another." (Defs.' Rule 56.1 Stmt., ¶ 11 (citing Mussey Decl., ¶ 8).)   Plaintiffs counter that "[the Center] is required to fix capitation rates 'on the basis of actual experience or retrospective actuarial equivalent based upon an adequate sample and other information and data,' 42 U.S.C. § 1395mm(a)(4), and has the discretion–and the duty–to consider capitation rates in counties in the same health-care area."  (Pls.' Rule 56.1 Counterstmt., ¶ 11.)  They do not cite to any statutory authority or evidence to support this latter assertion.

It is undisputed that the capitation rates for the counties that comprise New York City, *i.e.*, Bronx, Kings, New York, Queens, and Richmond counties (the "borough counties") are not (and never were) the same as those of Nassau, Rockland, Suffolk, and Westchester counties (the "Plaintiffs' counties" or "suburban counties").  And, as compared to each other, the capitation rates of the Plaintiffs' counties are not (and never have been) the same.

Regarding M+C, Defendants state "[c]ost sharing and supplemental benefits above and beyond required benefits under Medicare are determined by each managed care organization." (Defs.' Rule 56.1 Stmt., ¶ 15 (citing Downs Decl., ¶ 3).)  Defendants continue by stating that (until February 2006) it was the Center's Division of Financial Benefits that was responsible for, *inter alia*, reviewing and approving Adjusted Community Rate ("ACR") Proposals and Plan Benefit Packages  presented by HMOs participating in the M+C/MA program.  (*See id.*) Plaintiffs retort: "Cost-sharing and supplemental benefits above and beyond required benefits under Medicare are proposed by each managed care organization, but cannot take effect unless

approved by [the Center]."  (Pls.' Rule 56.1 Counterstmt., ¶ 15 (also citing Downs Decl., ¶ 3).)

Defendants' Rule 56.1 Statement continues with the explanation that (1) an ACR Proposal was the rate filing an M+C organization annually submitted to the Center that explained what benefits the organization wished to offer seniors and the pricing structure for those benefits;[10] and (2) a Plan Benefit Package sets forth the benefits that the organization proposed to provide seniors.  Before 2006, the Center's role was to review the ACR Proposals and Plan Benefit Packages and, if in compliance with applicable rules and regulations, approve them.  (*See* Downs Decl., ¶ 8 ("[the Center] had no discretion to equalize benefits or cost sharing among organizations in the same or different counties.  Its only role was to ensure that the organizations were following the rules and regulations that exist for the MA program.")  Therefore, the Center ensured (a) that participating HMOs offered at least the required Medicare-covered benefits, and (b) that if the average capitation rate for a county was greater than the ACR (*i.e.*, the HMO's cost of providing benefits), then the HMO would provide additional benefits or would reduce participating seniors' cost-sharing payments.  The Center was also required to ensure that the sum of the actuarial values of the ACR plus any proposed cost-sharing was no greater than the capitation rate.  The Center's review process was known as a "desk review".  Its standard of review was to ensure compliance with legal requirements and to ensure that the actuarial assumptions made by the organizations were reasonable; the Center did not verify the accuracy of an organization's information, nor did it compare benefits or ACR proposals made by different

---

[10]  The ACR Proposals consisted of spreadsheets explaining the projected cost of each component of the package of benefits Medicare required, as well as an explanation of the breakdown of proposed cost sharing (*e.g.*, premiums, co-payments and/or deductibles payable by seniors participating in the HMO).

organizations or in different counties.  Thus, Defendants state:

> [the Center] had no discretion in its review of ACR Proposals and
> [Plan Benefit Packages].  Its only role was to ensure that the
> organizations were following the rules and regulations that existed
> for the MA program.  If an organization had an "excess" (that is, its
> ACR was lower than the capitation rate in a particular county), the
> *organization* [, *and not the Center*, ] had the discretion to
> determine what, if any, additional benefits it would provide, and/or
> whether cost sharing would be reduced.  The Center had no input
> in determining *how* the excess was to be allocated [*e.g.*, providing
> additional benefits or reducing cost-sharing payments by seniors].

(Defs.' Rule 56.1 Stmt., ¶ 22 (emphasis added).)  Rather, it only ensured that any "excess" *did*

get allocated.  Plaintiffs dispute Defendants' position that the Center lacked discretion in

executing its review of ACR Proposals and Plan Benefit Packages, positing "[the Center]

possesses discretion to use its best judgment to insure that the ACR proposals are a 'realistic

reflection of the actual medical costs.'" (Pls,' Rule 56.1 Counterstmt., ¶ 22 (citing Downs' Dep.

at 119, 121).)

Under the current Medicare statute, organizations no longer submit ACR proposals.

Now, HMOs submit bids which substantially contain the same information as previously found

in ACR proposals.  Review of these bids are now done by the Office of the Actuary within the

Center, but the review process is similar to that previously done.

## II. Discussion

### A.  Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate only

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-moving party, that no rational jury could find in favor of the non-moving party. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, and/or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange, N.Y.*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence,"

and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Id.* (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the court in its determination of the summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will ultimately bear the burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence supporting an essential element of the non-movant's claim. *See id.* at 210-11. In such an instance, in order to defend against the motion for summary judgement, the non-movant must offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). And, in deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## B. *A General Description of Medicare*

> Medicare, the federal government's health insurance plan for the elderly and certain persons with disabilities, automatically provides coverage to qualifying individuals for inpatient treatment and related services under Medicare Part A. Medicare Part B, which covers visits to doctors and certain other outpatient treatment, is a *voluntary program* offering supplemental insurance coverage for those persons already enrolled in the Medicare "Part A" program.

*Matthews v. Leavitt*, 452 F.3d 145, 147 n.1 (2d Cir. 2006) (internal citations and quotations omitted; emphasis added). "Medicare Part C . . . allows a managed care organization to enter into a 'risk contract' to provide an enrollee a full range of Medicare services in exchange for monthly payments that the organization receives from the government." *Id.* (citations omitted).

> Medicare Part D provides coverage for prescription medications to qualifying enrollees.
>
> **. . .**
>
> Medicare+Choice was the revised form of Part C enacted as part of the Balanced Budget Act of 1997 . . . . Medicare+Choice was intended to allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare . . . [and to] enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options. The Medicare Prescription Drug Act has since replaced Medicare+Choice with the Medicare Advantage Program . . . .
>
> Generally, an enrollee is eligible to take part in Medicare Part C only if he is entitled to benefits under Part A . . . and enrolled under Part B. A participating organization must provide enrollees the benefits and services (other than hospice care) that are available to people living in the area served by the plan under Medicare Parts A and B and may also offer supplemental benefits approved by the Secretary of Health and Human Services.

*Id.* (citations and quotations omitted; brackets and parenthesis in original). (*See also* Proposed

Joint Pre-Trial Order, Part G, "Statement of Undisputed Facts" (providing an overview of the Medicare+Choice program and discussing "Benefits, Copays and Premiums" for M+C plans) (doc. #22).)

### C. Defendants' Motion for Summary Judgment on Plaintiffs' Equal Protection Challenge

<u>1.</u>    <u>Applicable Standard of Review: Rational-Basis</u>

"When a federal economic or social welfare program is challenged on equal protection grounds, and no suspect class or fundamental constitutional right is implicated, the proper standard of judicial review is rational basis, the 'paradigm of judicial restraint.'" *Minnesota Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805, 808 (8th Cir. 2001) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)). Thus, "[o]n rational-basis review, a classification in a statute . . . comes to [a court] bearing a strong presumption of validity." *Beach Commc'ns, Inc.*, 508 U.S. at 314 (citing *Lyng v. Auto. Workers*, 485 U.S. 360, 370 (1988)). Indeed, the party challenging the rationality of a legislative classification has "the burden 'to negative every conceivable basis which might support it.'" *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (internal quotation marks omitted)).

Further, a citizen's right to equal protection under the law is not violated when implementation of the law results in some inequality. *See Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (holding Congress does not violate equal protection "merely because the classifications made by its laws are imperfect"); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911) (holding Congress does not violate equal protection "because in practice [a

classification] results in some inequality").  Rather, "[i]n areas of social and economic policy, a statutory classification . . . *must* be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that *could* provide a rational basis for the classification." *Beach Commc'ns, Inc.*, 508 U.S. at 313 (emphasis added; quoted in *Minnesota Senior Fed'n*, 273 F.3d at 808).  Thus, "[w]here there are 'plausible reasons' for Congress' action, '[a court's] inquiry is at an end.'"  *Id.* at 313-14 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); brackets added).  This is so because "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted."  *Id.* at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (footnote omitted)).  Moreover, "[o]nly by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function."  *Id.* at 315 (quoting *Lehnhausen*, 410 U.S. at 365 (further citation omitted)); *cf. id.* at 316 ("The legislature must be allowed leeway to approach a perceived problem incrementally.") (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1995)); *City of New Orleans v. Duke*, 427 U.S. 297, 3030 (1976) ("Legislatures may implement their programs step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.") (citations omitted).

## 2. The Instant Case

The Parties agree that rational-basis review is the appropriate level of review in this case; they disagree, however, whether the subject M+C/MA program passes constitutional muster

13

under this paradigm.

Defendants assert that the M+C/MA program's payment formula is rationally related to the government's legitimate goals of containing Medicare costs while expanding health care options: the Center "has always established capitation rates pursuant to Congressionally mandated formulas which are rationally related to a legitimate Congressional goal of limiting Medicare costs and improving the delivery of services," (Defs.' Mem. Supp. Mot. Summ. J. at 8.), and the Center "has only a limited role in reviewing the benefit packages and costs to beneficiaries, to ensure compliance with statutory and regulatory requirements," (*id.*). Plaintiffs contravene this position, arguing that, while "Congress intended fairness and equity" in making the M+C/MA program available, the Center "uses wholly different methods of calculation . . . to compute health services costs for the purpose of calculating capitation payments on the one hand and financial requirements of an HMO delivering health services in the same county on the other hand, thereby guaranteeing substantially different outcomes." (Pls.' Opp'n Mem. at 6.) Therefore, Plaintiffs claim, "[t]he result of the dichotomy in procedures utilized by [the Center] for fixing capitation rates and reviewing county-based ACRs submitted by the HMOs is predictably irrational." (*Id.* at 13.) The Court disagrees. As discussed more fully below, the Center's calculations are statutorily mandated and Plaintiffs' claim that the information contained in ACRs should be considered in the setting of AAPCCs invites an apples to oranges comparison.

*(a) The Existence of a Better Methodology Does Not Render the
M+C/MA Program Unconstitutional*

Plaintiffs attempt to establish irrationality with the argument that although "[the Center]

14

has detailed, current information [in the form of ACRs], updated on an annual basis, as to the cost of providing health services . . . on a county-by-county basis," it does not use said information in calculating "capitation rates and the AAPCC as mandated by 42 U.S.C. §§ 1395w-23(c)(1)(D) and 1395mm(a)(4), *which require the government to calculate them based on whatever 'information and data' is available to it*." (Pls.' Opp'n Mem. at 14 (emphasis added).) This attempt fails.

To begin, Plaintiffs' first citation to subparagraph (D) of 42 U.S.C. § 1395w-23(c)(1) is only one of the four values that the Center was to consider in determining a county's annual M+C capitation rate. Readers shall recall from the "Background" section, (*see supra* p. 5.), that the Center was required to calculate four different values and then chose the highest of those four in setting each county's capitation rate.[11] Unexplained by Plaintiffs is why they do not cite the other three values that the Center must consider when setting a county's capitation rate. *See, e.g.*, 42 U.S.C. § 1395w-23(c)(1) ("For purposes of this part . . . each annual Medicare+Choice capitation rate, for a Medicare+Choice payment area that is an MA local area for a contract year consisting of a calendar year, is equal to the largest of the amounts specified in the following subparagraph (A), (B), (C), *or* (D)." (Emphasis added)). Moreover, there is no evidence in the record that the Center did not consider all four of these values. Therefore, Plaintiffs' reliance on this argument, tethered to the cited subparagraph, is unavailing.

Further, Plaintiffs' reliance on the second cited statute–42 U.S.C. § 1395mm(a)(4)–also falls short. This shortcoming is highlighted when the Court reads the entire statute, not just the

---

[11] Under the current program, the capitation rate is now set at the higher of a 2% increase over the previous year's capitation rate or 100% of the AAPCC.

selected language quoted by Plaintiffs.  Section 1395mm(a)(4) reads:

> (4)  For purposes of this section, the term "adjusted average per capita cost" means the average per capita amount that the Secretary estimates in advance (*on the basis of actual experience, or retrospective actuarial equivalent based upon an adequate sample and other information and data*, in a geographic area served by an eligible organization or in a similar area, with appropriate adjustments to assure actuarial equivalence) would be payable in any contract year for services covered under parts A and B of this subchapter, or part B only, and types of expenses otherwise reimbursable under parts A and B of this subchapter, or part B only (including administrative costs incurred by organizations described in sections 1395h and 1395u of this title), if the services were to be furnished by other than an eligible organization or, in the case of services covered only under section 1395x(s)(2)(H) of this title, if the services were to be furnished by a physician or as an incident to a physician's service.

(Emphasis added.)  Contrary to Plaintiffs' contention, the Center is not required to calculate capitation rates on "whatever 'information and data'" is available to it, (Pls.' Opp'n Mem. at 14), but, rather "(on the basis of actual experience, *or* retrospective actuarial equivalent based upon an adequate sample *and other information and data*, in a geographic area served by an eligible organization or in a similar area, with appropriate adjustments to assure actuarial equivalence) . . . ."  Thus, a fair reading of the statute shows–and the use of the disjunctive "or" connotes–that the Center is permitted to set a capitation rate using one of two basis (1) actual experience *or* (2) retrospective actuarial equivalent based upon (I) an adequate sample and (ii) other information and data.  Plaintiffs gloss over this choice, focusing on a portion of the second choice.  Likewise, Plaintiffs use of "whatever" in modifying "information and date" implies the Center must use *all* information and data available to it.  The statute does not require that.  Rather, it directs that "*other* information and data" be considered when the capitation rate is set using retrospective

16

actuarial equivalents.  There is no evidence in the record that this, in fact, did not occur.  Rather, the record shows that the Center does consider other information and data.  (*See, e.g.*, Downs Dep. at 119:5 to 120:18.)  And, simply because the Center is not considering the "information and data" Plaintiffs want the Center to consider, or that Plaintiffs believe the Center should consider, does not compel the conclusion that no "other information and data" is being considered by the Center or, more to the point, that the Center's determination of county capitation rates is irrational.  AAPCCs and ACRs measure different costs.

Finally, and perhaps most importantly, Congress has directed the Center to set capitation rates based on the cost of providing services on a fee for cost basis in a particular county and not on the basis of the cost of providing services on an HMO basis.  As stated earlier, in establishing the M+C/MA programs, Congress' stated intention was to provide Medicare eligible citizens with a wider array of health care options while, at the same time, containing the cost of Medicare.  In other words, Congress was willing to provide additional options in the form of HMOs so long as the budgetary cost did not exceed the cost of traditional Medicare, i.e. the cost of providing services on a fee for service basis.  Thus, Plaintiffs' argument that in setting capitation rates, the Center must consider the information in ACRs, i.e. information on the cost of providing services on an HMO basis, is antithetical to Congress' intent.

While the Court empathizes with the Plaintiffs' frustration over the cost differential of the M+C/MA program provided by organizations within the borough counties versus that provided by organizations within the Plaintiffs' counties, such difference is not sufficient to render the M+C/MA program unconstitutional.  Plaintiffs' showing that seniors in the borough counties do not have to pay a premium to participate in the M+C/MA program, while they, the Plaintiffs, do

have to pay premiums to participate in the program is not "a clear showing of arbitrariness or irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981). Rather, these differences highlight a resulting imperfection in the implementation of a rationally-based law. Supreme Court precedent makes clear that the resulting inequality in premium costs does not violate the Plaintiffs' equal protection rights. *See, e.g., Dandridge*, 397 U.S. at 485; *Lindsley*, 220 U.S. at 78. Indeed, while Plaintiffs make compelling arguments for the implementation of better methods for determining a county's capitation rate and for reviewing ACRs submitted by providing organizations, thereby reducing the difference between the two, these arguments–practical as they may be–do not render M+C/MA unconstitutional. As Senior District Court Judge Alsop of the U.S. District of Minnesota stated in finding the M+C program constitutionally rational:

> Medicare+Choice program increases health care options of a number of elderly Americans while reducing the strain on the public fisc. The fact that not all elderly Americans . . . do not enjoy the same windfall as others is unfortunate, but not unconstitutional. Perhaps there are better solutions or solutions that are more fair, but the Medicare+Choice payment method is certainly "rational" in a constitutional sense.

*Minnesota Senior Fed'n v. United States*, 102 F. Supp. 2d 1115, 1125 (D. Minn. 2000), *aff'd*, 273 F.3d 805 (8th Cir. 2001). Affirming the district court, the Eight Circuit stated, *inter alia*:

> It was not irrational or arbitrary for Congress to devise a payment formula based on local health care costs and then to encourage cost-efficient managed care providers to increase benefits for their Medicare enrollees. Though the resulting geographic benefit discrepancies may seem unfair, "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."

273 F.3d at 809 (quoting *Beach Commc'ns*, 508 U.S. at 313). Indeed, as the Eight Circuit

astutely observed:

> Distributing Social Security and Medicare benefits is a massive
> undertaking which "requires Congress to make many distinctions
> among classes of beneficiaries while making allocations from a
> finite fund." *Bowen v. Owens*, 476 U.S. 340, 345, 106 S. Ct. 1881,
> 90 L. Ed. 316 (1986). Accordingly, the Supreme Court has
> rejected numerous equal protection challenges to the ways in which
> these benefits are distributed. Congress adopted the
> Medicare+Choice program as a means of containing costs and
> expanding health care delivery options. These are legitimate
> objectives.

*Id.* at 808-09. The Eighth Circuit's observations warrant heeding. While presenting a cogent

argument for implementing better formulas in administrating the M+C/MA program, Plaintiffs,

nonetheless, have not negated every conceivable basis for supporting the rationality of these

formulas. Hence, the Eighth Circuit's reasons for holding the M+C program constitutional

continue to be valid here; since there are plausible reasons for using the formulas enlisted by

Congress–*i.e.*, administering a nation-wide health insurance system for senior citizens while

containing the government's costs in doing so–this Court's inquiry as to the constitutionality of

the program using those formulas is at an end. *See, e.g., Beach Commc'ns*, 508 U.S. at 313.

> *(b)  Recognition of a Health Care Region Does Not Render the*
> *M+C/MA Program Unconstitutional*

Plaintiffs also advance the Center's recognition of "New York Region 02"–comprising all

four suburban counties and three of the five borough counties–and a single schedule of per-

procedure costs for the region as a reason for finding the M+C/MA program irrational. However,

this reasoning does not rest on constitutionally solid grounds. The mere fact that the Center " has

19

recognized that there is no significant variation in the costs of physicians' services within seven counties implicated in this case" (Pls.' Opp'n Mem. at 15), does not morph the M+C/MA program into an irrational one.

That the fee for service rates of the suburban counties may be the same as the fee for service rates for some or all of the New York City counties does not dictate that the AAPCC for all the counties must be the same. The AAPCC is the projected cost of providing Medicare services on a fee for service basis in a particular county. As such, the AAPCC is affected by various actuarial factors. For example, the actuarially determined average number of doctor visits per year for the residents of county "X" may be more than the actuarially determined average number of doctor visits per year for the residents of county "Y," contributing to a higher AAPCC for county "X." Similarly, that county "X" is an urban area, with increased pollution and decreased living space, may result in a higher level of health problems leading to a higher projected yearly cost of providing services on a fee for service basis than for the residents of county "Y," a suburban county with more open spaces. The AAPCC also takes into account other demographic factors such as the age, sex, and disability status of the enrollees. *See* 42 C.F.R. § 417.588(c)(1). The point is the fact that the cost of a doctor visit is the same for residents of two neighboring counties, or that the residents of one county may go to the hospitals or doctors located in a neighboring county, does not necessarily equate to the projected costs of providing inpatient, outpatient, and related services on a fee for service basis to the residents of one county being the same as the projected cost of providing services to residents of the neighboring county.

As the Supreme Court has stated, "[I]n the administration of a fund [under the Social

Security Act] that is large enough to have a significant impact on the Nation's deficit, general rules must be examined in light of the broad purposes they are intended to serve." *Bowen v. Gilliard*, 483 U.S. 587, 598-99 (1987). The *Bowen* Court also noted: "General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." (*Id.* at 599 n.13 (quotations and further citations omitted)). It is not for the courts to decide that an economic or social statute or regulation is "wise" or:

> that it best fulfills the relevant social and economic objectives that [Congress] might ideally espouse, or that a more just and humane system could not be devised. . . . [T]he intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. . . . [While t]he Constitution may impose certain procedural safeguards upon systems of welfare administration, [it] does not empower this Court to second-guess . . . officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

*Bowen*, 483 U.S. 609 (quoting *Dandridge*, 397 U.S. at 487) (internal citation omitted). Thus, Plaintiffs address their argument to the wrong branch of the government; their desire "to compel a change in the Defendant's [sic] methodology so that residents of all nine counties implicated in this litigation are equally impacted by the government's financial constraints" (Pls.' Opp'n Mem. at 19) must be addressed to the Legislature, not this Court.[12]

---

[12] In a similar vein, Plaintiffs attempt to establish M+C's unconstitutionality by arguing, "Because [the Center] did not adequately fund capitation payments for a six-year period commencing in 1999, 411 M+C plans withdrew or reduced their service areas, affecting 2,462,000 beneficiaries." (Pls.' Opp'n Mem. at 11 (citing Cahn Aff., Ex. 9).) However, this is not an entirely accurate statement. Rather, according to the "Introduction" of the CRS Report for Congress entitled "Medicare+Choice: Plans leaving the Program," (*i.e.*, "Ex. 9" cited by Plaintiffs):

Furthermore, the fact that the Center has recently created the New York City metropolitan area as one of 26 health care regions in an attempt "to limit the variation of payment rates within regions" (Pls.' Opp'n Mem. at 17) cannot be used to support an argument that the predecessor programs (*i.e.*, M+C and MA) were unconstitutional. It is well-established that a subsequent amendment to earlier legislation will not be used to evidence the unconstitutionality of that earlier legislation. *See Smart v. Ashcroft*, 401 F.3d 119, 123 (2d Cir. 2005) ("A congressional decision that a statute is unfair, outdated, and in need of improvement does not mean that the statute when enacted was wholly irrational or, for purposes of rational basis review, unconstitutional."); *Skelly v. INS*, 168 F.3d 88, 92 (2d Cir. 1999) (noting Congress's repeal of former statute and replacement with another statute intended to provide more equal treatment of aliens "does not indicate that Congress thought the earlier law was arbitrary and irrational and hence unconstitutional"): *Howard v. United States*, 354 F.3d 1358, 1361-62 (Fed. Cir. 2004) ("[T]he fact that Congress repeals or modifies particular legislation does not reflect a judgment that the legislation, in its pre-amendment form, lacked rational support."). In any event,

> Plans withdrawing from the Medicare+Choice program, or reducing their service areas cite inadequate Medicare+Choice payments, increasing regulatory burden, and difficulty developing and maintaining provider networks as the primary reasons for leaving the program. Some analysts contend that withdrawals reflect strategic business decisions by Medicare+Choice organizations that transcend payment rate issues. Factors such as low enrollment and market competition may contribute to plan behavior. *Research suggests that plan behavior cannot be traced to a single cause*.

(Emphasis added.) As the Defendants aptly note, Plaintiffs cannot "support their contention that any such withdrawals [*i.e.*, the 411 nation-wide withdrawals] are due to differences in capitation rates." (Defs.' Reply Mem. at 6 n.6.) In any event, Plaintiffs' selective reliance on this CRS Report does not foster their claim of an equal protection violation.

authorization to choose another geographic divide for determining capitation rates, *see* 42 U.S.C. § 1395w-23(d)(2), is not the same as a mandate to do so. The fact that a rational alternative exists does not make the government's chosen, statutorily authorized, course of action "irrational". Therefore, here, the setting of capitation rates by county when there exists an authorized option to use an "equivalent as specified by the Secretary," 42 U.S.C. § 1395w-23(d)(2), does not render the M+C/MA program unconstitutional.[13] The use of county lines to establish capitation rates was a rational choice given the geographic size of this country, the number of participants in the program and the monetary size of the fund being administered.

### (c) Consideration of Amicus Suffolk County's Unique Perspective

In its discretion, the Court granted Suffolk County (the "County") permission to file an *amicus curiae* brief on the rationale that it would offer insights not available from the Parties, thereby aiding the Court in its determination of Defendants' Motion for Summary Judgment. *See Andersen v. Leavitt*, Civil Action No. 03-6115, Mem. & Order at 4 (E.D.N.Y. Aug. 13, 2007) (citing *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007); further citation omitted). Because of the important nature of Plaintiffs' challenge, the Court also allowed the parties to file responses to the County's *amicus* brief. Plaintiffs and Defendants both took advantage of this opportunity.

---

[13] For the same reasons, Plaintiffs' argument regarding re-basing fee for services, (*see* Pls.' Opp'n Mem. at 12), is without merit. Simply because the statute allows for the re-basing (*i.e.*, updating) of fee for services and AAPCC figures each year does not mean it was mandated to do so. (Rather, pursuant to the applicable statute, re-basing had to occur once every three years.) Hence, no constitutional violation will be found on this argument.

<u>i.</u>  <u>The County's Perspective</u>

In its motion seeking leave to file an amicus brief, the County stated its interests are similar to Plaintiffs', but not identical to them.  (*See* Malafi Supp. Decl., ¶ 5, attached to County's Mot. File Br. *Amicus Curiae* (doc. # 62).)  Indeed, the County does present one argument that is unique to it, to wit, that the disparate cost, availability, quality, and quantity of Medicare options and services in Suffolk County has a significant negative fiscal and social impact on the County and its residents.  (*See* County's Amicus Curiae Br. at 6-8 (doc. #62-3).)[14]

More specifically, the County asserts that there are only four companies offering M+C/MA program contracts to senior citizens and "under *nearly* every plan . . . enrollees must pay monthly premiums" which is in stark contrast to surrounding counties, including Nassau, Queens, Kings, and Bronx counties.  (*Id.* at 7 (emphasis added).)  The County argues that, due to lower capitation rates in Suffolk County, "[f]ewer companies want to do business in Suffolk County, and Suffolk County residents have fewer options, and seniors in Suffolk have no choice but to pay monthly premiums for Medicare coverage, putting Suffolk seniors at a severe financial disadvantage from their neighbors . . . ."  (*Id.*)  The County posits that because Suffolk seniors spend more on health care, they have less to spend on other items.  (*See id.* at 8.)  This, in turn, means Suffolk seniors "contribute less to the overall sales tax revenues" of the County, which the

---

[14]  The Court notes that the County's other argument, *i.e.*, there is no rational basis for calculating health care costs of Suffolk County seniors on the basis of their county of residence, is duplicative of one of the Plaintiffs' arguments.  The County adds nothing new to the Plaintiffs' county-residence-is-an-irrational-basis argument and, in any event, the Court has already addressed it *supra*.  Thus, since this argument does not provide a unique perspective and because it does not aid the Court in its determination of the Motion for Summary Judgment under consideration, the Court will not consider it further.

County relies heavily upon to meet its financial needs. (*See id.*)  The County avers "[a]ny diminution of sales tax receipts greatly impacts the County's economy and the lives of all 1.5 million residents of the County, because the loss of sales tax revenue *may* have to be made up by increases in other types of taxes and fees." (*Id.* (emphasis added).)  The County further speculates that some Suffolk seniors may be forced to leave the County because they can no longer afford to live there and this "will have a severe negative effect on the County and its residents." (*Id.*)

ii.  The Defendants' Response

Defendants' main contention with the County's position is that the County does not offer evidence to support its arguments and those arguments are based on "sheer speculation." (Defs.' Letter Br. at 2 (Aug. 14, 2007) (doc. #65).)  Defendants assert that the County's position as to the M+C/MA program depriving its senior of affordable and quality health care services is "simply not true" because "[a]ll senior citizens, in Suffolk and nationwide, are entitled to Medicare benefits under the traditional fee-for-service plan.  The M+C/MA program merely offers an alternative plan which *some* seniors find to be financially advantageous." (*Id*. (emphasis in original).)  Defendants also would have the Court discount the County's argument that premiums paid by Suffolk seniors enrolled in the M+C/MA program have a significant negative fiscal and social impact on the County and its residents because that argument is unsupported by any evidence.  And, even assuming such Suffolk County seniors would have additional income to infuse into the County's economy if they did not have to spend it on M+C/MA program premiums, the County has failed to show such infusion would be significant.  Similarly, Defendants view the County's possible-senior-flight argument to be purely speculative as no

evidence has been introduced to support this argument.

### iii.  The Plaintiffs' Response

Plaintiffs highlight the fact that the County's senior citizens have less choices of HMOs participating in the M+C/MA program than do seniors in neighboring counties and this fact is supported by public sources which is sufficient for evidentiary purposes.  (*See* Pls.' Response Br. at 6 and n.2 (doc. #66).)[15]  Plaintiffs also take the position that because the government acknowledged the possibility that additional sales tax revenue could be available to fatten the County's coffers if some of its seniors did not enroll in the M+C/MA program, this creates a legitimate issue warranting a trial.  (*See id.* at 10.)

### iv.  After Consideration of the County's Perspective, the Court Finds this Perspective Does Not Forestall the Conclusion that the M+C/MA Program Is Constitutional

While sympathetic to the fact that Suffolk County seniors have fewer HMOs to choose from if they wish to participate in Medicare's M+C/MA program than do seniors in neighboring counties and seniors in the borough counties, they still do have choices.  And, that there are fewer choices in providers does not render the M+C/MA program unconstitutional.  *See, e.g., Minnesota Senior Fed'n*, 273 F.3d at 808.  Likewise, simply because, by choosing to participate in the M+C/MA program, some County seniors have less monies to spend on tax-generating items (that would increase the County's revenues) does not mean they would so spend their monies; such seniors could also choose to save those monies, thereby having no effect on the

---

[15]    The Court notes that much of Plaintiffs' response focuses on the County's second argument, the so-called county-residence-is-an-irrational-basis argument (*see, supra*, note 14). That argument has already been addressed.

County's income generation.[16]  Finally, the County's "senior flight" argument is an attenuated one; there is no evidence that, as a result of M+C/MA program premiums, County seniors are moving out of the County in numbers that have a significant economic and/or social impact on the County and its residents.  Thus, having considered the County's unique perspective regarding Suffolk County seniors participating in the M+C/MA program under the required paradigm of judicial restraint, the Court finds no constitutional violation; the M+C/MA program remains rationally related to the government's purpose of providing its seniors with health care benefits while containing its costs in doing so, even if participation costs the County's seniors more than it does other seniors.[17]

* * *

In sum, Plaintiffs' have failed to sustain their burden to negative every conceivable basis which might support the constitutionality of the M+C/MA program of Medicare.  Rather, as Defendants adroitly state, "[Plaintiffs] simply offer an alternative way of calculating payments, costs and benefits which, they assert, would be 'better', and 'more equal,' to the extent that it is less costly to them."  (Defs.' Reply Mem. at 7.)  Thus, reviewed under the Supreme Court-mandated paradigm of judicial restraint, the subject M+C/MA program is rationally related to the government's purpose of providing health care to senior citizens while containing the costs of

---

[16] The Court would also note that to the extent that it is (or was) financially advantageous for some seniors to participate in the M+C/MA programs, as opposed to traditional (fee for services) Medicare, the availability of these programs gave those seniors more disposable income.

[17]  Consideration of the Parties' responses to the County's *amicus* brief does not change this finding.

providing said care.  Hence, Defendants are entitled to summary judgment on Plaintiffs'
Constitutional claims.

### D.  *The Motions for Summary Judgment on the FOIA Cause of Action*

Defendants move for summary judgment on Plaintiffs' FOIA claim arguing that the claim
is now moot.  According to the Defendants, they have fully responded to Plaintiffs' FOIA
requests as the requested documents were produced during discovery of this action.  They argue
that the FOIA requests and the requests for production of documents served in this case are
"virtually identical," "although the request for production was for a broader geographic scope
and for additional years."  (Def. Mem. at 17.)  As Defendants fully responded to the document
requests, Plaintiffs have received the FOIA documents they requested.  Therefore, according to
Defendants, the FOIA claim is moot.  The Defendants further argue  that "[t]he mere fact that
plaintiffs obtained the documents they sought, in the course of litigating their constitutional
claims, is not enough" to warrant the awarding of attorneys' fees in a FOIA suit.  (Defs.' Reply
Mem. at 11.)  Rather, "'in order for plaintiffs in FOIA actions to become eligible for an award of
attorney's fees, they must have been awarded some relief by a court, either in a judgment on the
merits or in a court-ordered consent decree.'" (*Id.* (quoting *Needletrades v. INS*, 336 F.3d 200,
206 (2d Cir. 2002) (further citation omitted)).)  In this case, there has been no judgment on
Plaintiffs' FOIA claim, and since all requested information has either been provided, is exempt
from turnover, or is publically available, there cannot be one.  (*See id.*)

Plaintiffs also move for summary judgment on their FOIA claim.  They argue that
Defendants have not responded to their FOIA request, Defendants should be enjoined from

withholding the requested documents and Plaintiffs should be awarded attorneys' fees. According to Plaintiffs, "the government's documentary response was not to the Plaintiffs' FOIA requests at all, but to discovery demands in this action." (Pls.' Mem. Supp. Mot. Summ. J. at 22-23.) Plaintiffs dispute that the FOIA requests and discovery demands are virtually identical and assert that the requests[18] were never responded to. Plaintiffs continue by complaining that in response to their discovery requests Defendants "produce[d] CD-ROM disks containing tens of thousands of pages of charts and statistics, without accompanying explanations, without pinpointing the material claimed to be responsive to the FOIA demands, and to point Plaintiffs' counsel to a public website containing the same data." (*Id.* at 23.) Based on this factual scenario, Plaintiffs claim entitlement to an order enjoining the Center from withholding records, together with attorneys' fees.

Having reviewed the parties' positions, the Court now turns to determining whether either party is entitled to summary judgment on FOIA cause of action and whether Plaintiffs are entitled to attorneys' fees.

### 1. *The FOIA Relief Sought is Moot*

In their FOIA request, Plaintiffs sought the following:

> 1. Documents whereby Nassau, Suffolk, Kings, Queens, Bronx, New York and Richmond Counties in the State of New York were designated as individual service areas for the Medicare+Choice Program.

---

[18] The Plaintiffs 56.1 Counterstatement is ambiguous as to whether the requests that were "not responded to" are the FOIA requests or the discovery requests. As discussed *infra*, upon review of the papers submitted by Plaintiffs on the FOIA issue, as well as the procedural history of this case, there can be no dispute that the requested discovery was produced.

2.  Documents showing, for the most recent year, the considerations and calculations by the Secretary of the Department of Health and Human Services of the capitation/reimbursement rate for the Medicare+Choice Program for each of the counties identified in Question #1.

3.  Documents showing, for the most recent year, the considerations taken into account by the Secretary in approving and disapproving the premiums, the cost sharing amounts and the benefits for the Medicare+Choice Program for each of the Counties specified in Question #1.

4.  Any documentation showing the consideration by the Secretary of projected cost savings between Medicare per capita payments to a plan offering Medicare+Choice Program in each of the Counties specified in Question No. 1, and what it would cost the plan to provide Medicare benefits to its commercial enrollees.

5.  With respect to each of the specified Counties for the most recent year, documentation showing whether the calculations were made to determine whether Medicare per capita payments to a Medicare+Choice Plan exceeds its costs.

FOIA letter request, dated November 7, 2003, submitted as Ex. 14 to Aff. of Richard Cahn.[19]

According to the chronology set forth by Plaintiffs, at a court conference held on September 1, 2004 (ten months after the FOIA request was made), defense counsel "suggested [Plaintiffs] place our still unanswered FOIA requests into a notice to produce" as counsel then "would have control over the process.  Accordingly, [Plaintiffs] First Notice to Produce was served upon [Defendants] on September 2, 2004."  (Pl. FOIA Reply Mem. at 5 (quoting

---

[19]  An earlier FOIA request, dated October 27, 2003, was apparently refused and returned. The two requests seek identical information. *Compare* Ex. 12 to Aff. of Richard Cahn *with* Ex. 14 to Aff. of Richard Cahn.

Plaintiffs' counsel letter dated October 27, 2004, submitted as Ex. 18 to Aff. of Richard Cahn.)

This chronology suggests that the FOIA requests were embodied in the Plaintiffs' First Notice to

Produce. Hence, the Court shall proceed to examine that notice.

The First Notice to Produce required the production of the following:

> 1. Documents whereby Nassau, Suffolk, Westchester, Rockland, Kings, Queens, Bronx, New York and Richmond Counties in the State of New York were designated as individual service areas for the Medicare+Choice Program(or, since January 1, 2004, the Medicare Advantage Program).

> 2. Documents showing, for each of the years 2001, 2002, 2003, 2004, and to the extent now known for 2005, (a) the calculations made by the Secretary of the Department of Health and Human Services in fixing the capitation/reimbursement rate for the Medicare+Choice Program (or, since January 1, 2004, the Medicare Advantage Program) for each of the counties identified in Paragraph No.1 and (b) any other matters considered by the Secretary in fixing such rates.

> 3. Documents showing, for each of the years 2001 through 2005, all matters considered by the Secretary in approving and disapproving the (a) premiums, (b) the cost sharing amounts and (c) the benefits for the Medicare+Choice Program (or, since January 1, 2004, the Medicare Advantage Program) for each of the Counties specified in Paragraph No. 1.

> 4. Any documentation showing the consideration by the Secretary of projected cost savings between Medicare *per capita* payments to a plan offering Medicare+Choice Program in each of the Counties specified in Paragraph No.1, and what it would cost the plan to provide Medicare benefits to its commercial enrollees.

> 5. With respect to each of the specified Counties for each
> of the years 2001 through 2005, inclusive, documentation
> showing whether the calculations were made to determine
> whether Medicare *per capita* payments to a
> Medicare+Choice Plan (or, since January 1, 2004, the
> Medicare Advantage Program) exceeds its costs.

Plaintiffs' First Notice to Produce Pursuant to Rule 34 of The Federal Rules of Civil Procedure,

dated September 2, 2004 (Docket No. 67).

A comparison of the FOIA Request with the First Notice to Produce makes clear that

Plaintiffs' FOIA requests were subsumed in the First Notice to Produce served by Plaintiffs. It is

readily apparent the only differences between the First Notice to Produce and the FOIA request is

that the notice calls for a broader geographic scope and a broader time period. The question

then becomes whether Plaintiffs have received the FOIA documents they sought. As discussed

below, the record demonstrates that the information was provided.

First, a review of the docket reveals that discovery has been completed. It further reveals

that Plaintiffs did not move to compel responses to its discovery requests in general, or to its First

Notice to Produce in particular. Indeed, the record demonstrates that, while Plaintiffs

complained about the lack of dispatch by which their discovery requests were answered, the

parties were able to resolve any discovery issues that may have existed.[20] Discovery was

---

[20] *See, e.g.,* Docket Nos. 14, 15, 17 and 19; the September 26, 2005 "Endorsed ORDER,"
granting the parties' request for an extension of time within which to file requests for a pre-
motion conference based on the representation that "[a]lthough *the parties have largely
completed discovery* as directed by the Court in its order dated June 6, 2005, *some follow-up
discovery remains to be produced* [and] . . . given the complex nature of the claims in this action,
*the parties seek additional time to analyze the information produced during discovery*."; the
December 1, 2005 "Electronic ORDER" denying the parties' request to adjourn the date for the

certified as complete with the filing of the pre-trial order.

Further, and most tellingly, the Plaintiffs fail to *specifically* identify–in either their moving papers, their opposing papers, or their reply papers–those documents (or category of documents) they sought from the government in their FOIA request that have not been provided. Indeed, conspicuously absent from their Rule 56.1 Statement in support of their motion for summary judgment, is any assertion that documents sought pursuant to their FOIA requests *remain* outstanding. Rather, Plaintiffs assert: "As of November 1, 2004 [i.e., more than a year prior to the making of the instant motions], Plaintiffs' FOIA request had not yet been responded to, except that the undersigned were referred to a website."

The record before this Court demonstrates that there is no legitimate factual dispute as to Plaintiffs' receipt of the documents sought in their FOIA request. Contrary to the position taken by the Plaintiffs, it is inconsequential that the documents were received as part of a discovery production, as opposed to a document labeled the response to their FOIA request.

Because the documents sought by the FOIA request were provided by the Defendants in discovery, Plaintiffs' claim for injunctive relief "enjoining [the Center] from withholding records so requested" is moot. As this Court wrote in *Sussman v. U.S. Dept. of Justice,* 2006 WL 2850608 (E.D.N.Y. 2006), "if the agency either complies or agrees to comply with the request, even if its reply is late or after litigation has begun, the requester's claim for relief under the FOIA is moot." *Id. *6 (citing *Fisher v. FBI,* 94 F. Supp. 2d 213, 217 (D. Conn. 2000); *Grove v.*

---

parties to file their pretrial order and stating that the Magistrate Judge "has determined that proposed joint pretrial orders should be prepared shortly after the close of discovery and, therefore, will not adjourn the filing of the proposed order sine die pending resolution of a summary judgment motion. And, as noted in the text, the pre-trial order was thereafter filed.

*CIA,* 752 F. Supp. 28 (D.D.C. 1990)). *Cf. Granite State Outdoor Adver. Inc. v. Town of Orange, Conn.,* 303 F.3d 450 (2d Cir. 2002) (voluntary cessation of allegedly illegal activities will usually render a case moot if there is no reasonable expectation that the alleged violation will recur and events have completely eradicated the effects of the alleged violation); *Polewsky v. Social Sec. Admin.,* 1996 WL 110179, *2 (2d Cir. 1996) (unpublished opinion) (dismissing as moot a Privacy Act claim wherein after commencement of action plaintiff was given access to his medical records through his representative because "[w]here a litigant receives the documents he seeks, an action to compel production of documents becomes moot"). Accordingly, Defendants are entitled to summary judgment dismissing Plaintiffs' FOIA claim.

The Court now turns to that portion of Plaintiffs' motion seeking attorneys' fees.

2. <u>Plaintiffs Are Not Entitled To Attorneys' Fees</u>

*(a) Pre-Buckhannon Precedent*

Generally in American courts, litigants bear their own costs–including attorneys' fees–regardless of the outcome of litigation; this is known as the "American Rule". *See Union of Needletrades v. INS*, 336 F.3d 200, 203 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). However, certain statutes authorize courts to "'reallocate the burdens of litigation.'" *Id.* (quoting *Peterson v. Continental Cas. Co.*, 282 F.3d 112, 119 (2d Cir. 2002) (further citation omitted)). The FOIA is one such statute that allows fee-shifting, *provided, however, that one can establish it has substantially prevailed in its FOIA cause of action. See* 5 U.S.C. § 552(a)(4)(E) (2000); *Needletrades*, 336 F.3d at 203.

Prior to the Supreme Court's decision in *Buckhannon Board and Care Home v. West*

*Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), in "determining

whether a FOIA plaintiff had 'substantially prevailed,'" courts within this Circuit "applied the

catalyst theory of recovery." *Needletrades*, 336 F.3d at 203 (citing *Vt. Low Income Advocacy

Council v. Usery*, 546 F.2d 509, 513 (2d Cir. 1976)). "Under the catalyst theory, as long as the

plaintiff satisfied certain criteria, a district court could award attorney's fees *even in the absence

of a favorable judgment on the merits*." *Id.* (emphasis added) (citations omitted).[21]

### (b) Buckhannon and its Subsequent Application

In the *Buckhannon* decision, the Supreme Court "reject[ed] the catalyst theory as a basis

for an award of fees under the Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. §

3601, *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, *et

seq.*" *Needletrades*, 336 F.3d at 203 (citing *Buckhannon*, 532 U.S. at 605). This rejection was

based on the reasoning that the catalyst theory "authorizes 'an award where there is no judicially

sanctioned change in the legal relationship of the parties.'" *Id.* at 214 (quoting *Buckhannon*, 532

U.S. at 605). Thus, "[t]he [Supreme] Court further held that where a plaintiff realizes the

objective of its lawsuit without a court-ordered consent decree or a judgment on the merits, a

---

[21] The Circuit Court cited to *Chesapeake Bay Foundation v. United States Department of Agriculture*, 11 F.3d 211 (D.C. Cir. 1993), for an articulation of the criteria to be considered:

> There are at least four considerations to be weighed by the court in determining whether an eligible FOIA litigant is also entitled to attorneys' fees: (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) whether the Government had a reasonable basis for withholding requested information.

11 F.3d at 216 (further citation omitted).

'defendant's voluntary change in conduct . . . lacks the . . . judicial *imprimatur*' necessary to render the plaintiff a prevailing party." *Id.* at 204-05 (quoting *Buckhannon*, 532 U.S. at 605). In such an instance, therefore, the plaintiff is not entitled to attorneys' fees.

Since the Supreme Court's decision in *Buckhannon*, the Second Circuit has had occasions to address the awarding of attorneys' fees under fee-shifting statutes other than the FHAA or the ADA. *See, e.g.*, *New York State Fed'n of Taxi Drivers v. Westchester County Taxi & Limousine Comm'n*, 272 F.3d 154 (2d Cir. 2001 ) (applying *Buckhannon* reasoning to Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988); *J.C. v. Reg'l Sch. Dist. 10, Bd. of Educ.*, 278 F.3d 119 (2d Cir. 2002) (applying *Buckhannon* reasoning to case brought under the Individuals with Disabilities in education Act, 20 U.S.C. §§ 1400 *et seq.*). Other circuit courts have, likewise, applied *Buckhannon* to other fee-shifting statues. *See Needletrades*, 336 F.3d at 205 (collecting cases applying *Buckhannon* in fee-shifting cases other than under the FHAA or under the ADA. Of relevance here, though, is the *Needletrades* case, in which the Second Circuit addressed the award of attorneys' fees under the fee-shifting provision of the FOIA. *See* 336 F.3d at 203-11.

Relying on the reasoning of a D.C. Circuit case, *Oil, Chemical & Atomic Workers International Union, AFL-CIO v. Department of Energy*, 288 F.3d 452 (D.C. Cir. 2002), the Second Circuit broadly applied the reasoning of *Buckhannon* and rejected the catalyst theory in the context of the FOIA. *See Needletrades*, 336 F.3d at 205. The Circuit Court's reliance on *Oil, Chemical & Atomic Workers* was well-founded as that case "address[ed] the precise question raised in" *Needletrades*, *id.*, *i.e.*, whether a FOIA plaintiff who has failed to secure either a judgment on the merits or a court-ordered consent decree is entitled to an award of attorneys'

36

fees.  *See id.*

In *Oil, Chemical & Atomic Workers*, the D.C. Circuit held that "in order for plaintiffs in FOIA actions to become eligible for an award of attorney's fees, they must have 'been awarded some relief by [a] court,' either in a judgment on the merits or in a court-ordered consent decree." 288 F.3d at 456-57 (quoting *Buckhannon*, 532 U.S. at 603).[22]  The D.C. Circuit Court went on to instruct that a court-ordered consent decree changes the legal relationship between a plaintiff and defendant.  *See id.* at 458 (quoting *Buckhannon*, 532 U.S. at 604 (in using the term "court-ordered consent decree", "the Supreme Court meant 'a court 'ordered chang[e] in the legal relationship between [the plaintiff] and the defendant.'" (further citations omitted)).  The *Oil, Chemical & Atomic Workers* plaintiffs were awarded no such relief; rather, "[t]he [district] court signed [a] document, which carried the heading 'Stipulation and Order'."  *Id.* at 457.  Upon reviewing the record, the D.C. Circuit Court determined this action was not the rendering of a judgment or the granting of a court-ordered consent decree; rather, the district court's issuance of the stipulation and order was the result of the parties' negotiations to resolve the case.  *See id.* Thus, the *Oil, Chemical & Atomic Workers* court held that the parties' stipulation and order "did not meaningfully alter the legal relationship of the parties[; rather i]ts only effect was to dismiss the [plaintiff's] lawsuit with a court order when no court order was needed."  *Id.* at 458.  Hence, no judicial relief was had.  *See id.* at 459.  Therefore, "[u]nder the rule of *Buckhannon*, the

---

[22] The *Oil, Chemical & Atomic Workers* court also discounted any distinction between the phrases "prevailing party" and "substantially prevail" used in various fee-shifting statutes. *See* 288 F.3d at 455.  It stated that it treats the "substantially prevail" language in FOIA as "the functional equivalent of the 'prevailing party' language" found in other fee-shifting statues.  *Id.* at 456 (citing *Foster v. Boorstin*, 561 F.2d 340, 342 (D.C. Cir. 1977)).

[plaintiff] . . . was not entitled to attorney's fees because it did not 'substantially prevail'." *Id.*

The *Needletrades* Court found the case before it factually analogous to the *Oil, Chemical & Atomic Workers* case because the *Needletrades* plaintiffs were able to resolve various disagreements with the defendants about the production of documents (that prompted plaintiffs' FOIA suit) without court intervention. *See* 366 F.3d at 205. Indeed, the parties "jointly reported that they had 'settled all of the substantive issues in the case,'" thus, "[t]he district court *never* granted any relief on the merits, nor was it asked to do so by [the plaintiffs]." *Id.* On the basis of this report, the *Needletrades* district court discontinued the action. *See id.* Significantly, plaintiffs never sought approval of the settlement agreement, nor did they request a consent decree. *See id.* Thus, "while [plaintiffs] may have accomplished the objective it sought to achieve by initiating this FOIA action, its failure to secure either a judgment on the merits or a court-ordered consent decree renders it ineligible for an award of attorney's fees under *Buckhannon*." *Id.* Relying on *Oil, Chemical & Atomic Workers*' reasoning, the Needletrades Court affirmed the district court's determination that the plaintiffs were not entitled to an award of attorneys' fees in their FOIA suit.[23]

### (c) The Instant Case

The record before the Court shows that as to their FOIA cause of action, the Plaintiffs

---

[23] Like the *Oil, Chemical & Atomic Workers* court, the *Needletrades* court also discussed that there was no real difference between a "prevailing party" and a "substantially prevailing" party as those terms are used in various fee-shifting statutes. *See id.* at 207-08 ("[A]ny difference between the term 'prevailing party,' as analyzed in *Buckhannon*, and the term 'substantially prevail[ing]' party, as used in FOIA, is not significant to our analysis."). Thus, the FOIA's "substantially prevails" language versus the FHAA's and the ADA's "prevailing party" phraseology is not enough to preclude the application of *Buckhannon* to a FOIA suit. *See id.*

were able to "accomplish[] the objective [they] sought to achieve by initiating this FOIA action . . . ." *Needletrades*, 366 F.3d at 205. That is, the Plaintiffs were able to secure those documents they requested of the Defendants to support their allegation of Equal Protection violation. Plaintiffs were able to meet this objective, however, without a court-ordered consent decree or a judgment on the merits of Plaintiffs' FOIA cause of action, or even a motion to compel production. Thus, there has been no judicially sanctioned change in the legal relationship of the Plaintiffs and Defendants. *See Buckhannon*, 532 U.S. at 605; *Needletrades*, 336 F.3d at 203. Therefore, there is no *Buckhannon*-mandated judicial *imprimatur* upon which an award of attorneys' fees can be based. Hence, Plaintiffs' motion for attorneys' fees is denied.

## CONCLUSION

For the foregoing reasons, (1) the Defendants' Motion for Summary Judgment (doc. #30) is GRANTED; and (2) the Plaintiffs' Motion for Partial Summary Judgment (doc. #38) is DENIED. The Clerk of Court is directed to close this case.

**SO ORDERED**

Dated: Central Islip, New York
        September 27, 2007

                                    /s/ _____
                                    Denis R.  Hurley
                                    Senior District Judge